IN THE
UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF IOWA


IOWA LIBERTARIAN PARTY and
JAKE PORTER,

        Plaintiffs,


VS.                           Civil Action No.  4:19-cv-00241-SMR-HCA


PAUL D. PATE, Secretary of State
and State Commissioner of Elections,

        Defendant.


**PLAINTIFFS' SUPPLEMENTAL FILING
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**


    By counsel, plaintiffs bring to the Court's attention the recent decision by the Sixth

Circuit Court of Appeals in *Graveline v. Benson*, ___ F.3d ___, 2021 WL 1165186 (6th Cir.

3/29/21), which accompanies this filing.


                                      /s/ *Robert M. Bastress*
                                  Robert M. Bastress
                                  West Virginia Bar ID # 263
                                  P.O. Box 1295
                                  Morgantown, W.Va.  26507-1295
                                  (304) 293-5308
                                  rmbastress@gmail.com

/s/ *Julia A. Ofenbakh*

Julia A. Ofenbakh
Iowa Defenders, PLLC
2183 86th St., Suite C
Clive, Iowa 50325
515-868-0088
julia@iowadefenders.com

Counsel for Plaintiffs


CERTIFICATE OF SERVICE

I, Robert M. Bastress, Jr., counsel for the plaintiff, certify that I have served the foregoing

Supplement to Plaintiffs' Motion for Summary Judgment on counsel for the defendant, Paul D.

Pate, by filing the same on the Southern District of Iowa's Pacer CM/ECF system on this the 20th

day of April, 2021.


/s/ *Robert M. Bastress, Jr.*

Bastress, Robert 4/20/2021
For Educational Use Only

Graveline v. Benson, --- F.3d ---- (2021)

2021 WL 1165186
Only the Westlaw citation is currently
available.
United States Court of Appeals, Sixth Circuit.

Christopher GRAVELINE; Willard H.
Johnson; Michael Leibson; Kellie K. Deming,
Plaintiffs-Appellees,
v.
Jocelyn BENSON, Secretary of State of
Michigan; Jonathan Brater, Director of
Michigan Bureau of Elections, in their
official capacities, Defendants-Appellants,
Dana Nessel, Attorney General of Michigan,
Intervenor-Appellant.
No. 20-1337

|
Argued: December 16, 2020
|
Decided and Filed: March 29, 2021

Synopsis
Background: Independent, non-partisan candidate
and voters who supported him brought action
alleging that Michigan laws governing independent
candidate's ability to be placed on ballot for
statewide office violated their constitutional rights
to freedom of speech and association, equal
protection, and due process. The United States
District Court for the Eastern District of Michigan,
Victoria A. Roberts, J., entered summary judgment
in plaintiffs' favor, 430 F.Supp.3d 297, and
denied state's motion to amend judgment, 2020 WL
1303211. State appealed.

Holdings: The Court of Appeals, Moore, Circuit
Judge, held that:

[1] plaintiffs had standing to bring action;

[2] action fell within scope of mootness exception
for wrongs capable of repetition, yet evading
review;

[3] statutory scheme was subject to strict scrutiny;
and

[4] Michigan's ballot access requirements, in
combination, violated plaintiffs' rights; and

[5] district court was within its discretion in
reducing from 30,000 to 12,000 number of
signatures required for qualifying petition for
statewide office.

Affirmed.

Griffin, Circuit Judge, dissented and filed opinion.

Procedural Posture(s): On Appeal; Motion for
Summary Judgment; Motion to Alter or Amend
Judgment.

West Headnotes (21)

[1]     Federal Courts—Jurisdiction
        Federal Courts—Standing

Bastress, Robert 4/20/2021
For Educational Use Only

Graveline v. Benson, --- F.3d ---- (2021)

[2] Federal Civil Procedure⊷In general; injury or interest

Court must determine whether standing exists at time of filing of complaint only.

[3] Declaratory Judgment⊷Subjects of relief in general

Independent, non-partisan candidate and voters who supported him had standing to bring action seeking declaratory judgment that Michigan laws governing independent candidate's ability to be placed on ballot for statewide office violated their constitutional rights to freedom of speech and association, equal protection, and due process, even though district court had granted preliminary injunctive relief placing candidate on ballot, where, at time they filed complaint, plaintiffs submitted evidence to show that Michigan's statutory scheme operated to deny candidate access to the ballot and restricted voters' opportunity to vote for candidate of their choice. U.S. Const. Amends. 1, 14; Mich. Comp. Laws Ann. §§ 168.544f, 168.590b(4), 168.590c(2).

[4] Federal Civil Procedure⊷In general; injury or interest
Federal Civil Procedure⊷Causation; redressability

To establish standing, plaintiff must show (1) it has suffered injury in fact that is concrete and particularized and actual or imminent, not conjectural or hypothetical; (2) injury is fairly traceable to defendant's challenged action; and (3) it is likely, as opposed to merely speculative, that injury will be redressed by favorable decision.

[5] Federal Courts⊷Inception and duration of dispute; recurrence; "capable of repetition yet evading review"

Unlike standing, which plaintiff does not have to maintain throughout entire litigation, case may become moot at any stage of litigation.

[6] Federal Courts⊷Rights and interests at stake
Federal Courts⊷Inception and duration of dispute; recurrence; "capable of repetition yet evading review"

Case is moot when issues presented are no longer live or parties lack legally cognizable interest in outcome.

Court of Appeals reviews de novo district court's decisions regarding standing and mootness.

Bastress, Robert 4/20/2021
For Educational Use Only

Graveline v. Benson, --- F.3d ---- (2021)

[7]  Federal Courts—Inception and duration
of dispute;  recurrence;  "capable of
repetition yet evading review"

Mootness exception for disputes capable
of repetition, yet evading review, applies
where (1) challenged action is in its
duration too short to be fully litigated
prior to cessation or expiration, and (2)
there is reasonable expectation that
complaining party will bear same action.

[8]  Constitutional Law—Mootness

Action by independent political candidate
and voters alleging that Michigan's
statutory ballot access requirements
violated their free speech, associational,
due process, and equal protection rights
fell within scope of mootness exception
for wrongs capable of repetition, yet
evading review; less than four months
elapsed between filing of complaint and
election date, any future challenges
would face same short window, laws at
issue were still valid and applicable to
any independent candidate, and voters
declared that they wish to vote for
independent candidates for statewide
offices in future elections. U.S. Const.
Amends. 1, 14.

[9]  Federal Courts—Summary judgment

Court of Appeals reviews district court's
grant of summary judgment de novo.

[10]  Constitutional Law—Elections in
general
Constitutional Law—Voting rights and
suffrage in general

When deciding whether state election
laws violate plaintiff's associational
rights and right to vote effectively under
First and Fourteenth Amendments, court
must weigh character and magnitude of
asserted injury to plaintiffs' constitutional
rights against precise interests put
forward by state as justifications for
burden imposed by its rule. U.S. Const.
Amends. 1, 14.

[11]  Election Law—Constitutionality and
validity

Bastress, Robert 4/20/2021
For Educational Use Only

Graveline v. Benson, --- F.3d ---- (2021)

---

Under *Anderson*-*Burdick* framework, if burden imposed by state election regulations on right to vote is severe, regulations will be upheld only if they are narrowly drawn to advance state interest of compelling importance, but if regulations are minimally burdensome, state's regulatory interests will likely justify reasonable, nondiscriminatory restrictions, and when regulation imposes intermediate burden, courts engage in flexible analysis, weighing burden on plaintiffs against state's asserted interest and chosen means of pursuing it.

When state election law imposes burden on rights protected by First and Fourteenth Amendments that weighs more heavily on identifiable political group whose members share particular viewpoint, associational preference, or economic status, court must focus on degree to which challenged restrictions operate as mechanism to exclude certain classes of candidates from electoral process; inquiry is whether challenged restriction unfairly or unnecessarily burdens availability of political opportunity. U.S. Const. Amends. 1, 14.

[12]   Election Law Constitutional and Statutory Provisions

When state's regulations limit opportunities of independent-minded voters to associate in electoral arena to enhance their political effectiveness as group, such restrictions threaten to reduce diversity and competition in marketplace of ideas, but existence of such barriers does not of itself compel close scrutiny, and courts must still examine in realistic light extent and nature of their impact on voters.

[14]   Constitutional Law Ballots and ballot access

When plaintiffs allege that statutory ballot access provisions, in combination, impose burden on their First and Fourteenth Amendment rights, court must consider combined effect of applicable election regulations, and not measure effect of each statute in isolation. U.S. Const. Amends. 1, 14.

[15]   Constitutional Law Ballots and ballot access

[13]   Constitutional Law Right to run for public office in general;  candidacy

---

Bastress, Robert 4/20/2021
For Educational Use Only

Graveline v. Benson, --- F.3d ---- (2021)

In evaluating claim that statutory ballot access regulations violate candidates' and voters' First and Fourteenth Amendment rights, court must consider several factors, including whether alternative means are available to exercise rights at issue; regulations' effect on voters, parties, and candidates; and evidence of real impact that restriction has on process. U.S. Const. Amends. 1, 14.

[16] Constitutional Law ⇨ Ballots and ballot access

Michigan's ballot access requirements that independent candidates for statewide office obtain 30,000 signatures, with at least 100 registered voters in each of at least half of Michigan's fourteen congressional districts, 50 days before majority parties' nomination conventions imposed severe burden on independent candidates' and voters' associational and voting rights under First and Fourteenth Amendments, thus provisions could be upheld only if they were narrowly drawn to advance state interest of compelling importance; major party candidates did not shoulder similar burden, cost of petitioning was significant, no independent candidate for statewide office had qualified for general election ballot since requirements were enacted, and there were no alternative means to qualify. U.S. Const. Amends. 1, 14; Mich. Comp. Laws Ann. §§ 168.544f, 168.590b(4), 168.590c(2).

[17] Constitutional Law ⇨ Elections in general

Under strict scrutiny review, state election regulations that impose severe burden on plaintiff's First and Fourteenth Amendment rights will be upheld only if state can demonstrate that there is no less restrictive means by which it can achieve its important interests. U.S. Const. Amends. 1, 14.

Bastress, Robert 4/20/2021
For Educational Use Only

Graveline v. Benson, --- F.3d ---- (2021)

[18] Constitutional Law⬦Ballots and ballot
access
Constitutional Law⬦Elections, voting,
or ballot access in general
Constitutional Law⬦Ballot access
Constitutional Law⬦Voters, candidates,
and elections
Election Law⬦Requisites and
sufficiency

Michigan's ballot access requirement that
independent candidates for statewide
office obtain 30,000 signatures, as
applied in combination with requirements
that they obtain at least 100 registered
voters in each of at least half of
Michigan's fourteen congressional
districts 50 days before majority parties'
nomination conventions, violated
independent candidate's and voters' free
speech, associational, due process, and
equal protection rights, notwithstanding
state's legitimate interests in preventing
voter confusion, ballot overcrowding, or
frivolous candidates, absent evidence that
signature requirement below 30,000 and
above 5,000 had resulted in ballot
overcrowding, voter confusion, or
frivolous candidates in any state. U.S.
Const. Amends. 1, 14; Mich. Comp.
Laws Ann. §§ 168.544f, 168.590b(4),
168.590c(2).

[19] Federal Courts⬦Pleading
Federal Courts⬦Injunction

Court of Appeals reviews scope of
district court's grant of injunctive relief
and denials of leave to amend under
highly deferential abuse-of-discretion
standard.

[20] Federal Courts⬦Abuse of discretion in
general

"Abuse of discretion" is defined as
definite and firm conviction that trial
court committed clear error of judgment.

[21] Injunction⬦Candidates and ballot
access

Bastress, Robert 4/20/2021
For Educational Use Only

Graveline v. Benson, --- F.3d ---- (2021)

District court was well within its discretion in entering permanent injunction reducing from 30,000 to 12,000 number of signatures required for qualifying petition for statewide office until Michigan legislature enacted permanent measure replacing invalidated scheme for independent candidates for statewide office after determining that scheme violated independent candidate's and voters' rights to freedom of speech and association, equal protection, and due process; Michigan legislature had determined that 12,000 signatures adequately protected its interests for populations approaching five million, and most recent gubernatorial election had total electorate of 4,250,585. U.S. Const. Amends. 1, 14; Mich. Comp. Laws Ann. §§ 168.544f, 168.590b(4), 168.590c(2).

West Codenotes

Held Unconstitutional

Mich. Comp. Laws Ann. §§ 168.544f, 168.590b(3), 168.590b(4), 168.590c

Unconstitutional as Applied

Mich. Comp. Laws Ann. §§ 168.544f, 168.590b(4), 168.590c(2)

Appeal from the United States District Court for the Eastern District of Michigan at Detroit. No. 2:18-cv-12354—Victoria A. Roberts, District Judge.

Attorneys and Law Firms

ARGUED: Erik A. Grill, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellants. Oliver B. Hall, CENTER FOR COMPETITIVE DEMOCRACY, Washington, D.C., for Appellees. ON BRIEF: Erik A. Grill, Heather S. Meingast, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellants. Oliver B. Hall, CENTER FOR COMPETITIVE DEMOCRACY, Washington, D.C., William P. Tedards, Jr., Washington, D.C., for Appellees.
Before: MOORE, GILMAN, and GRIFFIN, Circuit Judges.

MOORE, J., delivered the opinion of the court in which GILMAN, J., joined. GRIFFIN, J. (pp. —— – ——), delivered a separate dissenting opinion.

OPINION

KAREN NELSON MOORE, Circuit Judge.

*1 This is the parties' second time before our court in regard to the constitutionality of a constellation

Bastress, Robert 4/20/2021
For Educational Use Only

Graveline v. Benson, --- F.3d ---- (2021)

of Michigan laws that, in combination, govern an independent candidate's ability to be placed on the ballot for statewide office. Plaintiff-Appellee Christopher Graveline attempted to get his name on Michigan's November 2018 general election ballot as an independent, non-partisan candidate for attorney general. The other plaintiffs are registered Michigan voters who supported Graveline's candidacy and who intended to vote for him. Together, they challenge the Michigan laws that set forth the requirements for Graveline's name to appear on the general election ballot. Plaintiffs contend that these laws deprive them of their rights to freedom of speech and association, equal protection, and due process under the First and Fourteenth Amendments of the United States Constitution.

Previously, this court denied Defendants-Appellants' motion for an emergency stay pending their appeal of the district court's grant of a preliminary injunction in favor of Plaintiffs. The district court preliminarily enjoined the enforcement of the provisions on the grounds that Plaintiffs were likely to succeed in showing that the provisions violated their rights under the First and Fourteenth Amendments. Subsequently, the district court granted Plaintiffs' motion for summary judgment, denied Defendants' motion, issued a permanent injunction, and implemented an interim requirement allowing independent candidates to qualify for statewide offices by submitting a qualifying petition with 12,000 signatures. Defendants then filed a motion to amend the district court's findings to clarify the contours of the interim signature requirement, which the district court denied. Defendants now appeal the district court's grant of summary judgment in favor of Plaintiffs and the denial of their motion to amend.

Applying the analytical framework set forth by the Supreme Court in *Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), and in *Burdick v. Takushi*, 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992), we hold that the challenged provisions, applied in combination, impose a severe burden on the constitutional rights of independent candidates and their potential voter-supporters. Because the provisions are not narrowly drawn to advance compelling state interests, Michigan's statutory scheme for qualifying independent candidates to be placed on the ballot violates the Constitution. Due to the impermissible infringement on Plaintiffs' constitutional rights, we also conclude that the district court did not abuse its discretion in crafting its remedy. Thus, we AFFIRM the rulings of the district court.

## I. BACKGROUND

A. Factual Background
Michigan allows independent candidates running for statewide office to be placed on the general election ballot if the candidate submits an affidavit and a "qualifying petition." Mich. Comp. Laws § 168.590c (2008). A qualifying petition must have at least 30,000 valid signatures and must be submitted no later than "the one hundred-tenth day before the general election." *Id.*; *id.* § 168.544f. Additionally, a qualifying petition must be signed by at least 100 registered voters in each of at least half of Michigan's fourteen congressional districts ("geographic distribution requirement"). *Id.* § 168.590b(4). Moreover, the signatures on a qualifying petition must be obtained within 180

Bastress, Robert 4/20/2021
For Educational Use Only

Graveline v. Benson, --- F.3d ---- (2021)

days of the filing deadline. *Id.* § 168.590b(3). The filing deadline for the November 6, 2018 election was July 19, 2018. Therefore, the official process for an independent candidate trying to run for attorney general in the November 6, 2018 general election began in late January 2018—180 days prior to the July 19 deadline.

\*2 In contrast, the candidates for attorney general from the major political parties—Republican, Democratic, and Libertarian—are nominated at their party's convention rather than elected in a primary. The party must hold its convention "not less than 60 days before the general November election." Mich. Comp. Laws § 168.591(1). In 2018, that deadline fell on September 7, 2018. However, both the Republican and Democratic Parties held their nominating conventions on August 25, 2018. R. 1-3 (Graveline Decl. ¶ 3 n.1) (Page ID #30). Given this legally mandated timing sequence, an independent candidate likely would be ignorant of the identities of the major party nominees before the independent candidate filing deadline.

Graveline's efforts to qualify for the ballot reflect how the interplay of these deadlines affect independent candidates. Graveline waited to begin his attempt to qualify for the ballot until June 4, 2018. R. 1-3 (Graveline Decl. ¶ 9) (Page ID #33). His lack of knowledge of the major party nominees played a significant role in his delay. Graveline decided to enter the race for attorney general only "when it became reasonably clear to [him] that the Democratic and Republican Parties would be nominating candidates who d[id] not subscribe to [his] ideals." *Id.* ¶ 7 (Page ID #32). Thus, Graveline decided to run after learning the identity of the

candidate that the Democratic Party informally "endorsed" in April 2018 and the two candidates of the Republican Party who each "announced" at some undisclosed time. *Id.* ¶ 3 n.1 (Page ID #30); *id.* ¶ 4 (Page ID #4). A second factor also led to some delay in the launch of Graveline's campaign: Graveline served as an Assistant United States Attorney, and the Hatch Act required Graveline to resign from federal service before he could formally file as a candidate for an elected office. *Id.* ¶ 8 (Page ID #32–33).

From June 5 until the July 19 deadline, Graveline, along with 231 volunteers and a signature-gathering firm, collected 14,157 signatures. *Id.* ¶¶ 11, 15 (Page ID #34, 35). This effort required 1,000 hours of volunteer time and the expenditure of $38,000. *Id.* ¶15 (Page ID #35). Graveline attempted to file his petition on July 19, but the State rejected it because it did not contain 30,000 signatures.[1] R. 1-9 (Bureau of Elections Email) (Page ID #57).

**B. Procedural History**
Plaintiffs filed suit in the United States District Court for the Eastern District of Michigan on July 27, 2018, and moved for a preliminary injunction on August 3. R. 1 (Compl.) (Page ID #17); R. 4 (Pls.' Mot. For Prelim. Inj.) (Page ID #91). After briefing and argument, the district court granted the motion and ordered that "(1) Graveline must immediately present his qualifying petition ... to the Bureau of Elections; (2) The State must accept Graveline's filing as complete and determine the validity of the signatures in time to place Graveline on the ballot if he has sufficient valid signatures; and (3) If Graveline has at least 5,000 valid signatures ... [,] his name must be placed on the November 6, 2018 general election ballot as an independent candidate for the Office of Michigan Attorney General." *Graveline v. Johnson*, 336 F. Supp. 3d 801, 817 (E.D. Mich. 2018).

The district court issued its preliminary injunction after

Bastress, Robert 4/20/2021
For Educational Use Only

Graveline v. Benson, --- F.3d ---- (2021)

finding that Plaintiffs were likely to succeed on the merits of showing right, under the *Anderson*-*Burdick* framework, "the combination of Michigan's ballot access regulations severely burdens their fundamental rights under the First and Fourteenth Amendments." *Id.* at 812. The district court also found that Michigan "[fell] far short of satisfying its burden to show that the severe burdens caused by the scheme are justified." *Id.* at 815. Finally, the district court found that the remaining factors, "whether Plaintiffs would suffer irreparable injury absent an injunction; whether an injunction would cause substantial harm to others; [and] whether the public interest would be served by an injunction[,] weigh[ed] in favor of an injunction." *Id.* Defendants filed a notice of appeal on August 29, 2018. The same day, Defendants filed a motion in the district court to stay the preliminary injunction pending appeal. R. 14 (Defs.' Mot. to Dist. Ct. for Stay) (Page ID #171). The district court denied the motion for a stay on August 30.

*3 On September 4, 2018, Defendants moved this court for a stay of the district court's injunction pending appeal. We denied the emergency motion to stay, holding, inter alia, that based on the evidence in the record, Michigan's laws, in combination, created a severe burden on Plaintiffs' rights, and that the laws were not "narrowly drawn to protect [the State's] interests." *Graveline v. Johnson*, 747 F. App'x 408, 414–15 (6th Cir. 2018). Consequently, the Bureau of Elections reviewed Graveline's petition and placed him on the ballot for the November 2018 general election as an independent candidate for attorney general.

After discovery, both parties filed cross-motions for summary judgment, on which the district court heard argument. R. 28 (Defs.' Mot. For Summ. J.); R. 30 (Pls.' Mot. For Summ. J.). During the hearing, Plaintiffs clarified that, contrary to our statement in the denial of the motion for an emergency stay, *see Graveline*, 747 F. App'x at 410 n.1, they maintain their challenge to the geographic-distribution requirement because it "compound[s] the burden imposed by the high signature requirement [and] the early filing deadline." R. 60 (Summ. J. Hr'g Tr. 30–32) (Page ID #1424–26). Proceeding with that clarification, the district court granted Plaintiffs' motion for summary judgment. The district court first determined that Plaintiffs continued to have standing and that their claims were not moot, even though Graveline was placed on the ballot and the 2018 election had ended. *Graveline*, 430 F. Supp. 3d 297, 305–07 (E.D. Mich. 2019). Turning to the merits, the

district court again applied the *Anderson*-*Burdick* framework; however, it considered Defendants' new evidence and found that "none of it undermine[d] the Sixth Circuit's conclusion" that the provisions, as applied in combination, "severely burden[ ] independent candidates for statewide office and voters who wish to support for [sic] them." *Id.* at 314. After finding that strict scrutiny applied, the district court then considered whether Defendants "set forth precise interests of compelling importance" and showed that "the regulations are necessary and narrowly tailored to advance those interests." *Id.* at 315. The district court again found that Defendants had not met their burden. *Id.* at 317.

In granting summary judgment in favor of Plaintiffs, the district court permanently enjoined Michigan from enforcing Mich. Comp. Laws §§ 168.590c(2), 168.544f, and 168.590b(4) in combination against independent candidates running for statewide offices. *Id.* at 318. Because the 2020 election year was swiftly approaching, the district court also instated an interim measure allowing any independent candidate for statewide office to qualify for the ballot by submitting a qualifying petition with at least 12,000 valid signatures. *Id.* However, the statutory scheme's filing deadline still applies, as does its geographic-distribution requirement. *Id.* The court's order states that the interim measure will expire when the Michigan legislature enacts "a permanent measure replacing the invalidated scheme." *Id.* Defendants filed a motion to amend the court's findings, asking the district court to clarify that the new signature requirement was not a ceiling for any future legislative enactment. R. 45 (Defs.' Mot. To Alter Or Amend The Court's Findings at 3) (Page ID #1035). Defendants also asked the district court to establish a new maximum number of signatures that candidates may submit in conjunction with the new minimum. *Id.* The district court denied both requests. Defendants timely appealed the grant of summary judgment to Plaintiffs and the court's denial of their motion for summary judgment and motion to amend. R. 57 (Notice of Appeal) (Page ID #1383).

## II. ANALYSIS

### A. Jurisdiction

*4 [1]Defendants challenge the district court's conclusion that

Bastress, Robert 4/20/2021
For Educational Use Only

Graveline v. Benson, --- F.3d ---- (2021)

Plaintiffs have standing and that their claims are not moot. We review de novo a district court's decisions regarding standing and mootness. *Cleveland Branch, N.A.A.C.P. v. City of Parma*, 263 F.3d 513, 523, 530 (6th Cir. 2001) ("*Cleveland N.A.A.C.P.*"), *cert. denied*, 535 U.S. 971, 122 S.Ct. 1438, 152 L.Ed.2d 382 (2002).

### 1. Standing

[2] [3] [4]Defendants argue that the district court erred in finding that Plaintiffs had "standing to maintain their claims for declaratory relief" because after "the district court's granting of preliminary injunctive relief placing Graveline on the November 2018 ballot," Plaintiffs no longer have an actual or imminent injury. Appellants' Br. at 34–35. Defendants are wrong. Supreme Court and Sixth Circuit caselaw have consistently held that "the court must determine whether standing exists at the time of the filing of the complaint only." *Cleveland N.A.A.C.P.*, 263 F.3d at 524–26 (collecting cases). Defendants concede that Plaintiffs "arguably had standing as of the initial filing of this case." Appellants' Br. at 34–35. We hold that they did. A quick review of the facts supports our conclusion. To establish standing, "a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs.*, 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). At the time they filed the complaint, Plaintiffs submitted evidence to show that Michigan's statutory scheme operated to deny Graveline access to the ballot and restricted Voter-Plaintiffs' opportunity to vote for the candidate of their choice. R. 1-3 (Graveline Decl. ¶¶ 10–18) (Page ID #33–37) (describing the difficulties that Graveline faced in securing the required signatures, especially in light of the early filing deadline). Plaintiffs plainly allege a concrete actual injury that they traced back to Michigan's ballot-access laws for independent candidates. Furthermore, their injuries are redressable by a favorable decision holding the laws, in combination, unconstitutional as applied and allowing Graveline to be placed on the ballot. Consequently, we conclude that Plaintiffs had standing at the time they filed their complaint.

Defendants' attempt to argue that Plaintiffs must maintain standing throughout all stages of the litigation rests on a misreading of Supreme Court precedent. Defendants cite *Hollingsworth v. Perry* for the proposition that "Article III demands that an 'actual controversy' persist throughout all stages of litigation." 570 U.S. 693, 705, 133 S.Ct. 2652, 186 L.Ed.2d 768 (2013) (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90–91, 133 S.Ct. 721, 184 L.Ed.2d 553 (2013)) (discussing mootness and not standing); Appellants' Br. at 34. In the very next sentence, the Supreme Court explains that its statement "means that standing 'must be met by persons seeking appellate review, just as it must be met by persons appearing in courts of first instance.' " *Hollingsworth*, 570 U.S. at 705, 133 S.Ct. 2652 (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 64, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997)). Far from requiring plaintiffs to maintain standing throughout all stages of litigation, this narrow subset of standing caselaw requires intervenors seeking "to defend on appeal in the place of an original defendant" to show that they too "possess 'a direct stake in the outcome.' " *Arizonans for Official English*, 520 U.S. at 64–65, 117 S.Ct. 1055 (quoting *Diamond v. Charles*, 476 U.S. 54, 62, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986)). Consequently, *Hollingsworth* does not overturn long-established precedent holding that courts "must determine whether [a plaintiff's] standing exists at the time of the filing of the complaint only." *Cleveland N.A.A.C.P.*, 263 F.3d at 526. In sum, Plaintiffs have standing to bring this lawsuit.

### 2. Mootness

*5 [5] [6] [7]Defendants also argue that the district court erred in finding that Plaintiffs' claims were not moot after Graveline's placement on the 2018 ballot and the completion of the November 2018 general election. Appellants' Br. at 26–28. Unlike standing, which a plaintiff does not have to maintain throughout the entire litigation, a case may become moot at any stage of the litigation. *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 584 (6th Cir. 2006). "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). However, an "established exception to mootness" exists "for disputes capable of repetition, yet evading review." *Fed. Election Comm'n v. Wis. Right to Life, Inc.*, 551 U.S. 449, 462, 127 S.Ct. 2652, 168 L.Ed.2d 329 (2007). "The exception applies where '(1) the challenged

Bastress, Robert 4/20/2021
For Educational Use Only

Graveline v. Benson, --- F.3d ---- (2021)

action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again.' " *Id.* (quoting *Spencer v. Kemna*, 523 U.S. 1, 17, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998)). Plaintiffs, as the party asserting that the exception applies, bear the burden of establishing both prongs. *Lawrence v. Blackwell*, 430 F.3d 368, 371 (6th Cir. 2005), *cert. denied*, 547 U.S. 1178, 126 S.Ct. 2352, 165 L.Ed.2d 278 (2006).

[8]The district court properly determined that this case satisfies the first prong. "Challenges to election laws are one of the quintessential categories of cases which usually fit this prong because litigation has only a few months before the remedy sought is rendered impossible by the occurrence of the relevant election." *Id.* The facts of the instant case exemplify this problem; less than four months elapsed between the filing of the complaint and the occurrence of the election. Because the petition deadline falls so close to voting day, any future challenges will face the same problem.

Furthermore, the district court also properly determined that Plaintiffs' claims satisfied the second prong. In *Lawrence*, a similar ballot-access case, we held that "the controversy [was] capable of repetition" because "[t]he law at issue [was] still valid and applicable to both [the candidate-plaintiff] and any independent candidate [the voter-plaintiff] might wish to vote for in future election years." *Id.* In so concluding, we held that the candidate-plaintiff need not state that he planned to run again nor did the voter-plaintiff need to state explicitly that she "will wish to vote for an independent candidate who did not decide to run until after the early filing deadline passed." *Id.* In the case before us, not only are the laws at issue still valid and applicable to Graveline (and any other independent candidate who plans to run for statewide office), but also Plaintiffs declared that they wish to vote for independent candidates for statewide offices in future elections. R. 30-5 (Johnson Decl. ¶¶ 4–5) (Page ID #551); R. 30-6 (Leibson Decl. ¶¶ 4–5) (Page ID #554). Clearly, the controversy is capable of repetition. Moreover, we have held that "[e]ven if the court could not reasonably expect that the controversy would recur with respect to [the same parties], the fact that the controversy almost invariably will recur with respect to some future potential candidate or voter in [the state] is sufficient to meet the second prong because it is somewhat relaxed in election cases." *Lawrence*, 430 F.3d

at 372. Because Plaintiffs allege that their injury directly resulted from Michigan's current statutory scheme, any future independent candidate attempting to run for statewide office in Michigan will suffer the same harm. Plaintiffs have set forth evidence to establish that their challenge is capable of repetition yet evading review. Thus, the district court properly exercised jurisdiction, and so do we.

Defendants' argument that *Lawrence* is no longer good law after *Wisconsin Right to Life* is meritless. A careful reading of *Wisconsin Right to Life* reveals that the Supreme Court did not adopt a strict "same plaintiff same facts" requirement as Defendants suggest. *See* Appellants' Br. at 30–34. The Court even expressly stated that the argument Defendants here put forth—requiring that any future candidate's run must have all the same characteristics of Graveline's candidacy— "asks for too much." *Wis. Right to Life, Inc.*, 551 U.S. at 463, 127 S.Ct. 2652 ("Requiring repetition of every 'legally relevant' characteristic of an as-applied challenge—down to the last detail—would effectively [make the capable-of-repetition exception] unavailable for virtually all as-applied challenges."). The Court specifically referenced *Storer v. Brown*'s holding that even for as-applied challenges, cases are not moot when the issues presented and their effects on independent candidacies will persist because the state will apply the challenged statutes in future elections. *Id.* (citing *Storer v. Brown*, 415 U.S. 724, 737 n.8, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974)). Additionally, our Circuit has continued to apply the "somewhat relaxed" repetition standard in election cases after *Wisconsin Right to Life*. *See, e.g.*, *Libertarian Party of Ohio v. Husted*, 831 F.3d 382, 394 (6th Cir. 2016) (holding that an election law challenge was "capable of recurring, particularly given the ' "somewhat relaxed" repetition standard' that our Circuit recognizes in election cases" (quoting *Libertarian Party of Ohio*, 462 F.3d at 585)), *cert. denied*, ––– U.S. ––––, 137 S. Ct. 651, 196 L.Ed.2d 523 (2017); *Libertarian Party of Mich. v. Johnson*, 714 F.3d 929, 932 (6th Cir.) (same), *cert. denied*, 571 U.S. 1110, 134 S.Ct. 825, 187 L.Ed.2d 686 (2013). We therefore turn to the merits.

B. Constitutionality of Michigan's Statutory Scheme
*6 [9]We review the district court's grant of summary judgment de novo. *Libertarian Party of Ohio*, 462 F.3d at 583. Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact

Bastress, Robert 4/20/2021
For Educational Use Only

Graveline v. Benson, --- F.3d ---- (2021)

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Credibility determinations, the weighing of the evidence and the drawing of legitimate inferences from the facts are jury functions, not those of a judge ...." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

[10] [11]When deciding whether state election laws violate a plaintiff's associational rights and the right to vote effectively under the First and Fourteenth Amendments, we apply the framework set forth by the Supreme Court in *Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), and *Burdick v. Takushi*, 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992). The *Anderson*-*Burdick* framework requires us to weigh the "character and magnitude of the asserted injury" to plaintiffs' constitutional rights against the "precise interests put forward by the State as justifications for the burden imposed by its rule." *Anderson*, 460 U.S. at 789, 103 S.Ct. 1564. The appropriate balance is determined by the magnitude of the burden. If the burden is severe, the regulation will be upheld only if it is "narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S. at 434, 112 S.Ct. 2059 (quoting *Norman v. Reed*, 502 U.S. 279, 289, 112 S.Ct. 698, 116 L.Ed.2d 711 (1992)). If the regulations are minimally burdensome, the state's regulatory interests will likely justify "reasonable, nondiscriminatory restrictions." *Anderson*, 460 U.S. at 788, 103 S.Ct. 1564. Many regulations fall somewhere between these two extremes. When a regulation imposes an intermediate burden, "courts engage in a flexible analysis, weighing the burden on the plaintiffs against the state's asserted interest and chosen means of pursuing it." *Green Party of Tenn. v. Hargett*, 767 F.3d 533, 546 (6th Cir. 2014).

In denying Defendants' motion to stay the district court's preliminary injunction, we conducted a preliminary assessment of the magnitude of the burden imposed by Michigan's statutory scheme and held that it was severe. *Graveline*, 747 F. App'x at 413–14. On summary judgment, the district court applied the *Anderson*-*Burdick* framework, assessed Defendants' newly submitted evidence, and determined that the "combined effect of Michigan's ballot access regulations severely burdens independent candidates for statewide office and voters who wish to support [ ] them." *Graveline*, 430 F. Supp. 3d at 314. The district court also found that Defendants had not put forth sufficient evidence to show that

the provisions are narrowly tailored to protect the interests Defendants put forth as justifications. *Id.* at 316–17. Defendants challenge both determinations.

1. Character and Magnitude of Plaintiffs' Asserted Injury
We begin our analysis by assessing the character and magnitude of the asserted injury that Plaintiffs allege. Plaintiffs allege that Michigan's statutory scheme burdens two of our most fundamental rights—"the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Williams v. Rhodes*, 393 U.S. 23, 30, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968). The Voter-Plaintiffs' right to cast an effective vote "is of the most fundamental significance under our constitutional structure." *Burdick*, 504 U.S. at 433, 112 S.Ct. 2059. "The rights of political association and free speech occupy a similarly hallowed place in the political pantheon." *Libertarian Party of Ohio*, 462 F.3d at 585. "[W]hen a candidate wishes to appear as one party's standard-bearer and voters want to exercise their constitutional right to cast a ballot for this candidate, the [Supreme] Court has viewed state-imposed restrictions on this fundamental process with great skepticism." *Id.* at 588.

*7 [12]The Supreme Court also has recognized the importance of protecting independent candidates' access to the ballot. In *Anderson*, the Court warned that when a state's regulations limit "the opportunities of independent-minded voters to associate in the electoral arena to enhance their political effectiveness as a group, such restrictions threaten to reduce diversity and competition in the marketplace of ideas." *460 U.S. at 794, 103 S.Ct. 1564*. However, "[t]he existence of such barriers does not of itself compel close scrutiny." *Bullock v. Carter*, 405 U.S. 134, 143, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972). Courts must still "examine in a realistic light the extent and nature of their impact on voters." *Id.* Accordingly, we next assess the magnitude of the burden imposed by Michigan's statutory scheme.

[13]The Supreme Court instructs us to distinguish between burdens that restrict political participation equally and burdens that "fall[ ] unequally on new or small political parties or on *independent candidates*." *Anderson*, 460 U.S. at 793–94, 103 S.Ct. 1564 (emphasis added) (noting that such a

Bastress, Robert 4/20/2021
For Educational Use Only

Graveline v. Benson, --- F.3d ---- (2021)

discriminatory burden "impinges, by its very nature, on associational choices protected by the First Amendment"). When a burden weighs more heavily on "an identifiable political group whose members share a particular viewpoint, associational preference, or economic status," we must "focus on the degree to which the challenged restrictions operate as a mechanism to exclude certain classes of candidates from the electoral process." *Id.* at 793, 103 S.Ct. 1564 (quoting *Clements v. Fashing*, 457 U.S. 957, 964, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982)). "The inquiry is whether the challenged restriction unfairly or unnecessarily burdens 'the availability of political opportunity.' " *Id.* (quoting *Clements*, 457 U.S. at 964, 102 S.Ct. 2836). Plaintiffs contend that Michigan's statutory scheme falls within the Supreme Court's disfavored category of restrictions. Specifically, they argue that Michigan's filing deadline for independent candidates imposes an unequal burden by requiring independent candidates to conduct petition drives before major parties select their nominees and well in advance of the general election.

[14] [15] Furthermore, Plaintiffs argue that this unequal burden becomes heightened by the combination of (1) the amount of signatures Michigan requires—30,000, and (2) the geographic spread the 30,000 signatures must represent—at least 100 registered voters in each of at least half of Michigan's fourteen congressional districts. When plaintiffs allege that a statutory scheme, in combination, imposes a burden on their rights, we must consider "the combined effect of the applicable election regulations," and not measure the effect of each statute in isolation. *Libertarian Party of Ohio*, 462 F.3d at 586. Our precedent also directs us to consider several factors, including "whether alternative means are available to exercise [the rights at issue]; the effect of the regulations on the voters, the parties and the candidates; [and] evidence of the real impact the restriction has on the process." *Id.* at 587.

Beginning with *Anderson*, many courts have recognized the significant disadvantages imposed on independent candidates and minor parties by early filing deadlines. First, early filing deadlines serve to exclude or limit severely independent candidates "whose positions on the issues could command widespread community support" because they often must begin their run before the major parties' nominees are known. *Anderson*, 460 U.S. at 792, 103 S.Ct. 1564. An early filing deadline restricts independent candidates' opportunity to garner support from the most likely subset of voters—the

group that is dissatisfied with the choices within the two major parties—because such subset rarely becomes "a cohesive or identifiable group until ... [the] major parties stake[ ] out their positions and select[ ] their nominees." *Id.* at 791–92, 103 S.Ct. 1564; *see also* *Green Party of Tenn.*, 767 F.3d at 548 (explaining that early filing deadlines weaken independent and minor-party candidates' ability "to position themselves as meaningful alternatives"); *Libertarian Party of Ohio*, 462 F.3d at 590–91 (collecting cases). The Supreme Court also recognizes the concurrent burden an early filing deadline places on independent-minded voters as well. *Anderson*, 460 U.S. at 792, 103 S.Ct. 1564 (noting that early filing deadlines "den[y] the 'disaffected' not only a choice of leadership but a choice on the issues as well" (quoting *Williams*, 393 U.S. at 33, 89 S.Ct. 5)).

*8 Second, early filing deadlines burden the efforts of independent candidates as they attempt to gather petition signatures by striking at the core of their campaign efforts. Courts have consistently documented the damage early deadlines inflict on an independent candidate's ability to (1) recruit and retain volunteers, (2) gain media exposure, (3) solicit campaign contributions, and (4) engage voters' interest. *See* *Anderson*, 460 U.S. at 792 & n.14, 103 S.Ct. 1564; *see also* *Libertarian Party of Ohio*, 462 F.3d at 586 (noting that "[d]eadlines early in the election cycle require minor political parties to recruit supporters at a time when the major party candidates are not known and when the populace is not politically energized"; collecting cases). Consequently, courts have routinely applied strict scrutiny and struck down laws that required independent candidates (or minor parties) to file qualifying petitions substantially in advance of a primary election or nominating convention. *See, e.g.*, *Anderson*, 460 U.S. at 783 n.1, 103 S.Ct. 1564 (deadline seventy-five days before primary); *New Alliance Party of Ala. v. Hand*, 933 F.2d 1568, 1570 n.3 (11th Cir. 1991) (deadline sixty days before primary); *Cromer v. South Carolina*, 917 F.2d 819, 822 (4th Cir. 1990) (deadline seventy days before primary); *McLain v. Meier*, 637 F.2d 1159, 1164 (8th Cir. 1980) (deadline ninety days before primary); *Cripps v. Seneca Cnty. Bd. of Elections*, 629 F. Supp. 1335, 1338 (N.D. Ohio 1985) (deadline seventy-five days before primary); *Stoddard v. Quinn*, 593 F. Supp. 300, 306 (D. Maine 1984) (April 1 deadline, primary held on second Tuesday in June); *Bradley v. Mandel*, 449 F. Supp. 983, 985 (D. Md. 1978) (deadline seventy days before primary).

Bastress, Robert 4/20/2021
For Educational Use Only

Graveline v. Benson, --- F.3d ---- (2021)

Our circuit is no different. For example, in *Libertarian Party of Ohio*, we held that an Ohio law requiring minor parties to file a petition 120 days before the primary imposed a severe burden. *462 F.3d at 590*. In so holding, we emphasized the existence and effects of the same disadvantages—burdens on signature-gathering efforts and an inability to respond to issues raised later in the election year.[2] *Id. at 586–91*. In keeping with the Supreme Court's instructions, we noted "the great weight of authority that has distinguished between filing deadlines well in advance of the primary and general elections and deadlines falling closer to the dates of those elections." *Id. at 590*. Accordingly, we distinguished the case from *Lawrence*, where we upheld an Ohio law requiring independent congressional candidates to obtain signatures amounting to one percent of electors in the relevant congressional district. *Lawrence*, 430 F.3d at 370. There, we found the burden to be neither severe nor inherently unreasonable, in part because "all candidates seeking place on the ballot in November must engage in substantial campaign work before the early primary." *Id. at 373*. In *Lawrence*, we expressly emphasized that the filing deadline for independent candidates fell one day before the primary election. *Id.* (noting that the one-day separation between deadlines created "a vital distinction" from the "[t]he early deadline discussed in *Anderson*," which "imposed such a significant burden because it put independent candidates at a disadvantage vis-à-vis the major parties' nominees who were not named until nearly five months later"). We explained how the similar early deadlines for all candidates ensured that "there is no particular group which feels the additional burden of being placed at a disadvantage with respect to the rest of the field." *Id.* Thus, unlike in *Libertarian Party of Ohio*, we concluded in *Lawrence* that "the burden imposed by Ohio's early deadline is nondiscriminatory." *Id.*; *see also Wood v. Meadows*, 207 F.3d 708, 713–14 (4th Cir. 2000) (finding no severe burden when the filing deadline for independent candidates fell on the same day as the primary); *Council of Alt. Pol. Parties v. Hooks*, 179 F.3d 64 (3rd Cir. 1999) (holding no severe burden when the filing deadline for independent candidates fell a day before the primary).

*9 Michigan's statutory scheme exhibits disparate treatment of independent candidates for statewide office in a manner that is comparable to other early filing deadline cases. The nominating conventions for major parties were required to be held by September 7; Graveline was required to submit his petition on July 19, a 50-days-in-advance deadline. Crucially, unlike in *Lawrence*, major party candidates and independent candidates do not shoulder a similar burden. Here, the major party candidates are not required to obtain advance support during the same time that an independent candidate must canvas for signatures. And the burden shouldered by independent candidates is not reasonable because their filing deadline "[is] substantially in advance" of the majority parties' nomination conventions. *Lawrence*, 430 F.3d at 373–74 & n.2. Unlike our concerns in *Lawrence*, here it is the major parties that have a "flexibility" that independent candidates do not. *Id. at 374*; *see also Anderson*, 460 U.S. at 790–91, 103 S.Ct. 1564 (noting that early filing deadlines for independent candidates set in advance of major party nominations grant "[c]andidates and supporters within the major parties ... the political advantage of continued flexibility" and impose "a correlative disadvantage" on independent candidates and their supporters).

We acknowledge that, by late April, the Democratic Party had informally endorsed (but not formally nominated) its candidate; however, the Republican Party nominee was still unknown. R. 1-3 (Graveline Decl. ¶¶ 3–4) (Page ID #30–31). Thus, the early filing deadline burdened Graveline by shortening the time he had to campaign effectively because voters had yet to make up their minds about their satisfaction with the potential major party nominees. As several courts have determined, attempts to begin collecting signatures before this dissatisfied group coalesces often will be burdensome. Far from being a "general statement[ ] of the law," Dissent at 37, the Supreme Court, our court, and other courts have consistently recognized the burdens imposed by early filing deadlines, with or without explicit factfinding in the record before them, by relying on evidence of obstacles documented in prior cases. *See, e.g., Anderson* 460 U.S. at 791–92 & n.14, 103 S.Ct. 1564 (citing a Maryland district court's findings of fact as support for the Court's conclusion that an Ohio early filing deadline imposed a severe burden on "an independent candidate's organizing efforts"); *see also Libertarian Party of Ohio*, 462 F.3d at 586 (citing cases assessing other states' filing deadlines to support its conclusion that an Ohio early filing deadline negatively impacted a minor party's ability "to recruit supporters" and to respond to "contentious issue[s] raised" later in the election year); *McLain*, 637 F.2d at 1164 (same for North Dakota); *Council of Alt. Pol. Parties v. Hooks*, 121 F.3d 876, 880 (3rd Cir. 1999) (same for New Jersey). And, even if Graveline and the public were "at least aware of who the [major-party] contenders were" before the filing deadline, Appellants' Br. at

Bastress, Robert 4/20/2021
For Educational Use Only

Graveline v. Benson, --- F.3d ---- (2021)

50, future elections might have different circumstances, and the concerns highlighted in *Anderson* "remain significant" as applied to Graveline or any future candidate. *Nader v. Brewer*, 531 F.3d 1028, 1038 (9th Cir. 2008).

[16] All told, Michigan's system works to disadvantage independent candidates alone by requiring them to seek a significant number of signatures from an electorate that is not yet politically energized and to stake out positions in a race with yet undecided contours. Thus, we break no new ground in concluding that the combination of the 30,000-signature requirement, the geographic-distribution requirement, and the filing deadline imposes a severe burden on independent candidates.

The evidence in the record exposes the severe burden that Michigan's statutory scheme and its inherent disadvantages impose on independent candidates' access to the ballot. First, Michigan's history reveals the severity of this burden. The current statutory scheme is the only way independent candidates can qualify for the ballot. No other alternative means exist. Since its implementation in 1988, no independent candidate for statewide office has managed to complete a qualifying petition.[3] R. 1-2 (Winger Decl. ¶ 5) (Page ID #21). However, since 1997, at least thirty candidates have formed the required committees to begin collecting signatures to qualify for the ballot as an independent candidate for statewide office.[4] *Graveline*, 430 F. Supp. 3d at 302; *see* R. 34-2 (Results For Mich. Att'y Gen. Comms.) (Page ID #653); R. 34-3 (Results For Mich. Sec'y of State Comms.) (Page ID #659); R. 40-1 (Results For Mich. Governor Comms.) (Page ID #786). Even though several candidates formed their committees after the filing deadline, many more formed their committees before the deadline, and some well in advance. *See, e.g.*, R. 40-1 (Results For Mich. Governor Comms. at 21, 23, 42, 65) (Page ID #805, 807, 826, 849). The dissent points out that these committees were formed for gubernatorial candidates whose major party counterparts are not nominated at a convention but instead are selected via the traditional primary process, which takes place much closer to the independent party filing deadline. *See* Dissent at 31. This difference does somewhat diminish the relevance of the evidence, but *Jenness v. Fortson* counsels us not to forget basic principles. 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971). In *Jenness*, the plaintiffs challenged a statutory scheme with a filing deadline for independent candidates that matched the filing deadline for parties participating in the

primary election. *Id.* at 433–34, 91 S.Ct. 1970. But there was one important finding that distinguishes *Jenness* from this case: record evidence showed that independent candidates had previously qualified for the ballot. *Id.* at 439, 91 S.Ct. 1970. This evidence allowed the Supreme Court to conclude that Georgia "in no way freezes the status quo" and thus "[t]he open quality of the Georgia system [was] far from merely theoretical." *Id.* Whether hindered or unhindered by an early filing deadline, independent candidates in Michigan have not appeared on the ballot. That is a reality we cannot discount.[5]

*10 The signature requirement plays an important role in explaining the absolute dearth of independent candidates appearing on the ballot. When considered as a percentage of the state's population, there are fifteen states with higher requirements. R. 28-8 (Kelly Report at 4) (Page ID #402). But, in terms of absolute numbers only five states have higher requirements. R. 28-5 (Winger Report at 3) (Page ID #375). The fact that no independent candidate for statewide office has appeared on the Michigan ballot in thirty years indicates that a reasonably diligent candidate could not meet the signature requirements within the signature-collection window. *See Storer*, 415 U.S. at 742, 94 S.Ct. 1274 (stating that "[p]ast experience will be helpful, if not always an unerring, guide: it will be one thing if independent candidates have qualified with some regularity and quite a different matter if they have not").

Second, Defendants' petition expert, Lee Albright, established in his report that an independent candidate's compliance with Michigan's statutory scheme requires substantial costs of human and financial resources to qualify a petition-candidate for the ballot. R. 28-7 (Albright Report). Albright explained that (1) successful all-volunteer efforts to qualify a petition-candidate for the ballot are unusual; (2) most all-volunteer efforts fail and "professionals are used to augment signature gathering efforts"; (3) had Graveline used the entire 180 days "his costs per signature might have been lower"; and (4) mounting an all-volunteer effort requires significant labor, planning, and costs. *Id.* at 1–3 (Page ID #390–92). Albright also clarified that the actual number of signatures an independent candidate must gather is much higher than 30,000. "Assuming a 75% validity rate, 40,000 signatures must be gathered." *Id.* at 1 (Page ID #390). However, a 75% validity rate is the industry standard. For volunteers, that rate can be "difficult to maintain," and

Bastress, Robert 4/20/2021
For Educational Use Only

Graveline v. Benson, --- F.3d ---- (2021)

requires a laborious verification process. *Id*. Albright's report throws into sharp relief the difficulties that independent candidates face in attempting to comply with Michigan's requirements. No matter when a candidate starts, efforts to comply with the requirements will be arduous, time-consuming, and costly, even if professional signature-gatherers aid in the attempt. *Id*. at 1–3 (Page ID #390–92).

Albright also raised several factors that impact the efficacy of volunteer efforts to qualify a petition, even if professional signature-gatherers supplement their efforts. *Id*. Notably, many of these factors weigh against an independent candidate's success. For example, Albright stated that a campaign would need "a significant group of volunteers ready to go on day one," consistent availability of good venues, and the financial ability to deal with any increases in price-per-signature as efforts become more demanding. *Id*. at 1–2 (Page ID #390–91). For a candidate to rally these resources without the backing of large organizations or an established political machine is inherently difficult, as evidenced by Graveline's petition-gathering efforts. *See, e.g.*, R. 1-8 (Byrd Decl. ¶ 6) (Page ID #54) (describing how public officials hampered volunteers' petition-gathering efforts at a prime venue). The early filing deadline for independent candidates also interacts negatively these factors. As detailed earlier, it will be difficult to recruit and retain a significant volunteer force and to gather financial resources in the early months of the year long before major-party nominees are identified and the general election is imminent. *Anderson*, 460 U.S. at 792, 103 S.Ct. 1564.

In at least one other case, we have considered whether the incidental costs of campaigning by themselves can "constitute exclusion or virtual exclusion from the ballot." *Libertarian Party of Ky. v. Grimes*, 835 F.3d 570, 575 (6th Cir. 2016), *cert. denied*, ––– U.S. ––––, 137 S. Ct. 2119, 198 L.Ed.2d 197 (2017). In *Grimes*, minor parties challenged Kentucky's ballot-access scheme that required them to obtain a certain number of signatures in order for their candidates to be placed on the ballot. *Id*. at 572–73. The plaintiffs argued that the "hypothetical maximum cost of petitioning" to "field a full slate of candidates for every state and county office during an actual four-year term" would exclude the party from the ballot and thus imposed a severe burden on ballot access for the party. *Id*. at 576–77. We held that such "incidental costs of gathering signatures on petitions do not come close to exclusion from the ballot," in part because the plaintiffs did

not demonstrate "any likelihood" that they "would actually field a full slate of candidates." *Id*. at 577. However, Plaintiffs here do not argue that independent candidates' exclusion rests on costs alone, and the circumstances of *Grimes* are distinguishable in three other significant ways from the case at hand. First, in *Grimes*, we dealt with the "high costs of gathering and filing petitions" as applied to associations attempting to field a full slate of candidates for each office and "not as applied to any individual candidate for a specific office," which is the issue we face here. *Id*. at 573. Second, in *Grimes*, despite the plaintiffs' arguments that the regulations' requirements were impossible to meet for third parties, third parties had qualified under the statutory scheme several times in the past. *Id*. at 576. Not so here. Finally, the third parties in *Grimes* had a reasonable alternative means of ballot access besides the challenged requirements. *Id*. at 575–76. No one disputes that in Michigan, the challenged statutory scheme is the only means by which independent candidates can access the ballot. The circumstances that supported a finding of an intermediate burden in *Grimes* do not exist in the instant case.

\*11 Clearly, the Michigan statutory scheme places "a particular burden on an identifiable segment of [Michigan's] independent-minded voters." *Anderson*, 460 U.S. at 792, 103 S.Ct. 1564. The record reveals that the challenged requirements inhibit independent candidates for statewide office from recruiting supporters, disrupting the status quo, ensuring that existing political parties do not monopolize elections, and engaging in one of our democracy's most honored and essential political activities—representing like-minded individuals in an election for the right to govern. Consequently, we hold that Michigan's statutory scheme for qualifying independent candidates for the ballot imposes a severe burden on Plaintiffs' associational and voting rights.

Our recent decision in *Kishore v. Whitmer* does not counsel us to hold otherwise. 972 F.3d 745 (6th Cir. 2020). In *Kishore*, we reviewed an appeal from two independent candidates for president and vice president seeking placement on the ballot in Michigan. They challenged the same statutory scheme at issue in this case, arguing that, as applied, the statutory scheme, in combination with Michigan's orders restricting in-person gatherings during the COVID-19 pandemic, was unconstitutionally burdensome under the First and Fourteenth Amendments. *Id*. at 749. Applying the *Anderson*-*Burdick* framework, we held that the

Bastress, Robert 4/20/2021
For Educational Use Only

Graveline v. Benson, --- F.3d ---- (2021)

ballot-access restrictions placed only an intermediate burden on the plaintiffs when enforced alongside Michigan's stay-at-home orders. *Id. at 750*. However, we began our opinion in *Kishore* by reminding the reader that the district court in *Graveline* imposed an "interim measure" reducing the "signature requirements for independent candidates" to 12,000 signatures and that the lower requirement "is still in effect." *Id. at 748 & n.1*. Accordingly, the burden we analyzed in *Kishore* is in no way similar to the 30,000-required signatures and other requirements under review in this case. The original 30,000-signature requirement is more than double the 12,000-signature requirement applicable in *Kishore*, engenders different considerations, with or without a pandemic, and necessitates a different conclusion.

That impactful fact also distinguishes *Kishore* from this case in another important aspect. The interim 12,000-signature requirement foreclosed using the historical record at issue in this case, *i.e.*, the complete absence of any independent candidate ever qualifying for the ballot, to demonstrate that the statutory scheme and stay-at-home orders, in combination, imposed a severe burden on the rights of independent candidates and voters who wish to vote for them. *See, e.g.*, *Green Party of Tenn., 767 F.3d at 547–48* (finding a historical record that showed a consistent absence of minor parties from Tennessee's ballots less relevant after an amendment to the challenged statutory scheme). Instead, the plaintiffs in *Kishore* could put forward evidence of only their own struggles in gathering signatures under the statutory scheme and COVID restrictions. And we found it relevant to note that during the period before the stay-at-home orders went into effect, despite their campaign activities, the plaintiffs did not obtain "a single signature on their qualifying petition." *Kishore, 972 F.3d at 749*. This reality heavily influenced our determination that the stay-at-home orders did not play a substantial role in burdening the *Kishore* plaintiffs' ability to get onto the ballot. In the instant case, Plaintiffs challenge a completely separate issue, and we assess considerably more burdensome statutory requirements.

We find unpersuasive Defendants' arguments that the burdens imposed by the provisions are not severe. Defendants begin by analyzing the effect of each of the challenged provisions individually instead of assessing their combined effect as applied. Appellants' Br. at 40. This technique fails to heed our precedent, which instructs Defendants that the "inquiry is not

whether each law individually creates an impermissible burden but rather whether the combined effect of the applicable election regulations creates an unconstitutional burden." *Libertarian Party of Ohio, 462 F.3d at 586*. Defendants also cite *Lawrence*, *Storer*, and *De La Fuente v. California, 278 F. Supp. 3d 1146, 1155 (C.D. Cal. 2017)*, as cases where courts have held that similar requirements, in particular higher signature requirements, were not a severe burden. Appellants' Br. at 43–44. However, each case is easily distinguishable. In *Lawrence*, we did not find that the requirements severely burdened independent candidates in large part due to the filing deadline falling on the day before the primary for major parties, but here the deadline is at least fifty days earlier. *Lawrence, 430 F.3d at 373–74*. In *Storer*, the Supreme Court remanded the case because there was not enough evidence in the record to determine whether the requirements severely burdened the plaintiffs, in part because no evidence existed showing whether independent candidates regularly qualified for the ballot. *Storer, 415 U.S. at 740–43, 94 S.Ct. 1274*. That evidence is in the record for this case: independent candidates have *never* qualified for the Michigan ballot. This also contrasts with *De La Fuente*, where the evidence showed that independent candidates *had* qualified for the ballot in the past. *De La Fuente, 278 F. Supp. 3d at 1154*.

*12 Defendants further argue that Graveline's "dilatoriness" and unreasonable delay under the circumstances "placed him in a race against the clock—not the statutes," and thus, "there is no way to assess the burden imposed by the signature requirement." Appellants' Br. at 52. Defendants' focus on Graveline and his unique circumstances is misplaced. The question is "could a reasonably diligent independent candidate be expected to satisfy the signature requirements, or will it be only rarely that the unaffiliated candidate will succeed in getting on the ballot?" *Storer, 415 U.S. at 742, 94 S.Ct. 1274*. The evidence shows that an unaffiliated candidate has *never* been on the Michigan ballot, even though Defendants' records show that several candidates formed their campaign committees well in advance of the filing deadline. According to Albright's report, "gathering 30,000 valid signatures ... within the 180 days allowed can most certainly be done." R. 28-7 (Albright Report at 3) (Page ID #392). But he does not identify a single successful petition drive. "Moreover, the fact that an election procedure *can* be met does not mean the burden imposed is not severe." *Libertarian Party of Ohio, 462 F.3d at 592* (emphasis added). As Albright's report detailed, efforts to comply with the requirements, whether

Bastress, Robert 4/20/2021
For Educational Use Only

Graveline v. Benson, --- F.3d ---- (2021)

accomplished solely by volunteers or also by paying professional signature-gatherers, will exact a high cost in human and financial resources. R. 28-7 (Albright Report at 1–3) (Page ID #390–92). The early filing deadline reinforces the burdens imposed by these difficulties. *Anderson*, 460 U.S. at 792, 103 S.Ct. 1564.

In sum, by leveraging historical records, showing a lack of alternative means to qualify, and identifying specific burdens imposed by the statutory scheme, Plaintiffs have satisfied their burden to establish that the combined effect of Michigan's statutory scheme imposes a severe burden on their rights. For ballot-access cases, we have noted that "[t]he hallmark of a severe burden is exclusion or virtual exclusion from the ballot." *Grimes*, 835 F.3d at 574. Defendants have not put forth any evidence to justify disregarding this telling hallmark. Thus, we hold that the district court correctly determined that the combined effect of Michigan's laws imposes a severe burden on the First Amendment rights of independent candidates and their potential voter-supporters. Therefore, we will uphold the provisions only if they are "narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S. at 434, 112 S.Ct. 2059 (quoting *Norman*, 502 U.S. at 289, 112 S.Ct. 698).

2. Strict Scrutiny of Michigan's Asserted Interests

Defendants assert that the challenged provisions protect several legitimate interests. Defendants correctly point out Supreme Court and Sixth Circuit caselaw recognizing that states have "an important interest in ensuring that candidates demonstrate a 'significant modicum of support' before gaining access to the ballot, primarily to avoid voter confusion, ballot overcrowding, and frivolous candidacies." *Grimes*, 835 F.3d at 577 (quoting *Jenness*, 403 U.S. at 442, 91 S.Ct. 1970). Defendants argue that the geographic requirement advances these interests "by requiring statewide candidates to show a modicum of support from voters within roughly half the state." Appellants' Br. at 40. Similarly, Defendants contend that the 30,000-signature requirement serves the same interests "by requiring unaffiliated candidates, who lack the support and interest of a major or even minor party, to demonstrate they have a significant modicum of public support for their candidacy." *Id.* at 42. The Supreme Court has also recognized that "as a practical matter," States must regulate in "substantial ways ... the time, place, and manner of holding primary and general elections" for both state and federal

elections in order to ensure that elections "are to be fair and honest" and orderly. *Storer*, 415 U.S. at 730, 94 S.Ct. 1274 (citing U.S. Const. art. I, § 4, cl. 1); *see also* *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 364, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997) (noting that "[s]tates certainly have an interest in protecting the integrity, fairness, and efficiency of their ballots and election processes as means for electing public officials"). Accordingly, we have recognized that "easing administrative burdens on boards of elections are undoubtedly 'important regulatory interests.'" *Ohio Democratic Party v. Husted*, 834 F.3d 620, 635 (6th Cir. 2016). Defendants assert that the filing deadline advances these interests because "it is part of a carefully constructed set of election deadlines," which the Director of Elections created to ensure that candidates are certified in time for the election and absentee voters receive their ballots in a timely fashion. Appellants' Br. at 45–46.

*13 [17]Plaintiffs do not dispute, and we agree, that the challenged provisions serve compelling interests. However, under strict-scrutiny review, Defendants are "obligated to demonstrate that there was no less restrictive means by which [they] could achieve [their] important interest[s]." *Lawrence*, 430 U.S. at 375. The Supreme Court observed that "it is especially difficult for the State to justify a restriction that limits political participation by an identifiable political group whose members share a particular viewpoint[ or] associational preference." *Anderson*, 460 U.S. at 793, 103 S.Ct. 1564. We keep this observation firmly in mind as we apply strict scrutiny to each of Defendants' asserted interests.

At the outset, we note that Defendants again address each provision separately and make no arguments to demonstrate how the provisions as applied in combination are the least restrictive means by which they could achieve their compelling interests. Furthermore, Defendants fail to discuss at all how the geographic-distribution requirement is narrowly drawn. Instead, they dismiss it as irrelevant to the analysis because Graveline satisfied the requirement. Appellants' Br. at 40–41. Defendants' flawed understanding of how to defend against a combined-effect challenge undermines their ability to satisfy their burden.

Defendants submitted uncontested evidence from the former Director of Elections that demonstrates how the early filing

Bastress, Robert 4/20/2021
For Educational Use Only

Graveline v. Benson, --- F.3d ---- (2021)

deadline is a part of a carefully constructed scheme, such that any alterations would necessitate changes to the whole system. R. 28-2 (Williams Aff.). The former Director details how the deadline intersects with the Secretary of State's duty to certify qualified candidates, initiatives, and constitutional amendments for inclusion on the ballot so that each county's board of elections has sufficient time to print and distribute ballots for the general election. *Id.* at 2–9 (Page ID #352–59). Plaintiffs do not contest that the filing deadline is narrowly tailored to advance Michigan's interest in administering a timely and orderly election.

Plaintiffs also do not argue that the geographic-distribution requirement fails to survive strict scrutiny. And we are reluctant to disturb the district court's finding that the geographic-distribution requirement so survives. Requiring 100 signatures from seven out of fourteen districts appears to be the least restrictive means of ensuring that an independent candidate has a modicum of statewide support.

[18]But Defendants fail to provide any evidence to demonstrate that the 30,000-signature requirement is narrowly drawn to protect Michigan's interests in preventing voter confusion, ballot overcrowding, or frivolous candidates, especially as combined with the early filing deadline. In arguing that the requirement is narrowly tailored, Defendants rely solely on Dr. Kelly's analysis that shows that a requirement of 5,000 signatures *could* lead to nine or more candidates on the ballot, R. 28-8 (Kelly Report at 9) (Page ID #407), and Albright's statement that it is possible for an independent candidate to collect 30,000 signatures. R. 28-7 (Albright Report at 3) (Page ID #392); Appellants' Br. at 54. But as the district court explained, those conclusions establish "nothing about the current challenged 30,000 requirement" and whether that amount is necessary for Michigan to prevent overcrowding and frivolous candidates. *Graveline*, 430 F. Supp. 3d at 316. Furthermore, Defendants never disputed Winger's evidence that "no state that required more than 5,000 signatures has ever had more than eight candidates on the general election ballot for statewide office." R. 30-3 (Winger Rebuttal Report at 2) (Page ID #517). Nothing in the record demonstrates that a signature requirement below 30,000 and above 5,000 has resulted in ballot overcrowding, voter confusion, or frivolous candidates in any state. As the Supreme Court held in *Williams*, "[n]o such remote danger can justify the immediate and crippling impact on the basic constitutional rights involved in this case." 393 U.S. at 33,

89 S.Ct. 5. Defendants fail to show how requiring independent candidates to gather 30,000 signatures is the "least drastic means to achieve their ends" of preventing ballot overcrowding or frivolous candidates from accessing the ballot. *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 185, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979) (noting that for ballot-access cases, it "is particularly important" to require "States adopt the least drastic means to achieve their ends"). Instead, in this case, the 30,000-signature requirement, when combined with the early filing deadline and the geographic-distribution requirement, serves only to prevent the qualification of *any* independent candidate for the ballot unless the candidate can mobilize substantial resources in adverse conditions.

*14 We recognize that moving the filing deadline closer to the date of the nominating convention or lowering the 30,000-signature requirement might impose some additional costs on the State. But the First and Fourteenth Amendments' guarantees often necessitate that states shoulder some burdens. We acknowledge that Michigan has the power to enact statutes governing the time, place, and manner by which independent candidates for statewide office may qualify for a general election. In isolation, each of Michigan's requirements may impose a reasonable burden on constitutional rights. However, the combined effect of these provisions imposes a severe and unequal burden on the associational rights of independent candidates and their potential voter-supporters. Because Defendants have not shown that these provisions are narrowly tailored to protect compelling state interests, we hold that Michigan's system for qualifying independent candidates violates the First and Fourteenth Amendments of the Constitution.

## C. Relief Granted

[19] [20]Finally, Defendants challenge the district court's interim measure allowing independent candidates to qualify to be placed on a ballot for statewide office with a minimum of 12,000 signatures. They also challenge the court's denial of their motion to amend its findings, which asked the district court to set a new maximum for the signature requirement. Appellants' Br. at 57–63. We review the scope of a district court's grant of injunctive relief and denials of leave to amend under the highly deferential abuse-of-discretion standard. *See Sec'y of Labor v. 3Re.com, Inc.*, 317 F.3d 534, 537 (6th Cir. 2003); *GenCorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d

Bastress, Robert 4/20/2021
For Educational Use Only

Graveline v. Benson, --- F.3d ---- (2021)

---

804, 832 (6th Cir. 1999); Fed. R. Civ. P. 52(b). "Abuse of discretion is defined as a definite and firm conviction that the trial court committed a clear error of judgment." *Bowling v. Pfizer, Inc.*, 102 F.3d 777, 780 (6th Cir. 1996), *cert. denied*, 522 U.S. 906, 118 S.Ct. 263, 139 L.Ed.2d 190 (1997).

[21]As a court of equity, the district court was well within its discretion in choosing to reduce the number of signatures required for a qualifying petition until the Michigan legislature "enacts a permanent measure replacing the invalidated scheme for independent candidates for statewide office." *Graveline*, 430 F. Supp. 3d at 318; *Brown v. Bd. of Educ.*, 349 U.S. 294, 300, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) ("Traditionally, equity has been characterized by a practical flexibility in shaping its remedies."); *see also Ohio Democratic Party*, 834 F.3d at 623 ("Federal judicial remedies, of course, are necessary where a state law impermissibly infringes the fundamental right to vote."). In fashioning its remedy, the district court first noted that because an election year approached, "the [c]ourt fe[lt] compelled to make sure a procedure is in place now for independent candidates for statewide office to access the ballot." *Graveline*, 430 F. Supp. 3d at 318. As the district court aptly observed, "having some ballot access requirements for independent statewide candidates—even if temporary—is better than the alternative of none." *Id.* The absence of any requirements would serve only to actualize Defendants' fears of overcrowding and frivolous candidates. Thus, in reducing the number of signatures required, the remedy addresses the combined effect of the statutory scheme but still accounts for the uncontested evidence that Defendants set forth to defend the necessity of the early filing deadline.

Defendants take exception with the selection of 12,000 signatures. However, that number is more than double the district court's original 5,000-signature requirement. And it considers the scant evidence that Defendants introduced showing that it was *possible* that a requirement of 5,000 signatures may lead to ballot overcrowding and frivolous candidates. *Id.* Furthermore, Defendants, despite ample prompting throughout the litigation, have never argued for or suggested a different requirement. Nor is the number as arbitrary as Defendants attempt to make it appear. The district court selected the number from Michigan's minimum requirement for qualifying petitions in districts with populations up to 4,999,999, which is the rung just below the statewide requirement. Mich. Comp. Laws § 168.544f. Considering that the Michigan legislature has determined that 12,000 signatures adequately protect its interests for populations approaching five million and the most recent gubernatorial election had a total electorate of 4,250,585, Appellants' Br. at 60, we cannot say that the district court made a clear error in judgment in requiring independent candidates to collect at least 12,000 signatures to qualify for statewide offices. Finally, in granting this relief, the district court clarified that it "did not intend to tell the Michigan Legislature what future changes to the ballot access framework would or would not pass constitutional scrutiny." *Graveline v. Benson*, No. 18-12354, 2020 WL 1303211, at *2 (E.D. Mich. Mar. 19, 2020) (order). In short, "the [c]ourt has done its best to create a workable interim provision without treading too far into matters best left to the State." *Green Party of Ga. v. Kemp*, 171 F. Supp. 3d 1340, 1374 (N.D. Ga. 2016) (entering a permanent injunction with an interim requirement of 7,500 valid signatures in order to be "sensitive to the State's interests"). Thus, we hold that the district court did not abuse its discretion in crafting its remedy.

*15 Defendants' argument that the district court abused its discretion by failing to set a new maximum number of signatures is also unavailing. As the district court pointed out, Defendants never raised the issue until after the district court entered final judgment. *Graveline*, 2020 WL 1303211, at *2. But setting that aside, Defendants have not shown how the district court's refusal would result in manifest injustice. *GenCorp*, 178 F.3d at 834. Defendants claim that in allowing 60,000 signatures to remain the maximum while the minimum is lowered to 12,000, Michigan will have to review many more signatures than is needed to qualify, which will be "a considerable burden." Appellants' Br. at 62. This possibility seems very remote considering that no candidate has ever qualified before and the evidence in the record establishing the substantial amount of time, resources, and finances that candidates would have to expend in order to reach even 30,000 signatures. *See* R. 28-7 (Albright Report at 2–4) (Page ID #390–92). Candidates have no incentive to expend resources collecting far more signatures than is necessary to qualify. Therefore, we also hold that the district court did not abuse its discretion by declining to amend its findings.

III. CONCLUSION

Bastress, Robert 4/20/2021
For Educational Use Only

Graveline v. Benson, --- F.3d ---- (2021)

---

We recognize that "[t]he role of this court is not to impose our own idea of democracy upon the [Michigan] state legislature." *Libertarian Party of Ohio*, 462 F.3d at 587. Instead, it is our responsibility to ensure that Michigan's provisions for qualifying independent candidates for statewide office fall within the bounds of what the First and Fourteenth Amendments require. Our careful review of the facts and circumstances leads us to conclude that the 30,000-signature requirement, geographic-distribution requirement, and filing deadline, when viewed in combination, unconstitutionally burden Plaintiffs' First Amendment rights.

For all of the reasons set forth above, we AFFIRM the judgment of the district court.

GRIFFIN, Circuit Judge, dissenting.

DISSENT

Three years ago, the district court ordered that the State of Michigan place an unqualified independent candidate for attorney general on the November 2018 general election ballot. *Graveline v. Johnson*, 747 F. App'x 408, 418 (6th Cir. 2018) (Griffin, J., dissenting). We refused to stay that decision, *id.* at 416 (maj. op.), and today double down in affirming the district court's rewriting of Michigan's election laws governing ballot access. Specifically, under the district court's permanent injunction, independent candidates for statewide office may now submit 3,000 fewer signatures (12,000) than partisan candidates for the same office (15,000) and may now submit the same number of signatures as those required for an election district that is only a fourth of Michigan's population. M.C.L. § 168.544f. Percentages also tell the story of the district court's drastic remedy we now approve. The statute's 30,000-signature threshold represents just over seven tenths of a percent (.72%) of the 4,142,044 votes cast for attorney general in the 2018 general election. The district court's diminishing of the requirement to 12,000 signatures is even more miniscule, reducing an already low bar

to a third of its former height. Because I cannot agree that Michigan's ballot-access laws unconstitutionally infringe upon plaintiffs' rights under the First Amendment, I respectfully dissent.[1] I would reverse the district court's judgment.

I.

A.

In holding the combined effect of the laws at issue impose a severe burden on plaintiffs' First Amendment rights, my colleagues—as they did when we previously denied defendants' motion to stay—treat as definitive the historical fact that no independent candidate has submitted a qualifying petition for a statewide office since 1988. *See Graveline*, 747 F. App'x at 414. That is error. Historical evidence is "not conclusive in and of itself," and represents instead just "a helpful guide." *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 589, 590 (6th Cir. 2006). And, what was said earlier remains true today: "the mere absence of independent candidates, in and of itself, says little about the effect of these restrictions; for all we know, Graveline could be the first and only independent candidate to even attempt to qualify for the statewide ballot under Michigan's current scheme." *Graveline*, 747 F. App'x at 417 (Griffin, J., dissenting). And as I detail next, he plainly is the only such individual to try to do so.

*16 The majority opinion tries to fill this gaping evidentiary hole with record evidence establishing that thirty other individuals formed committees to run as independent candidates for statewide offices. But this purported proof of disparate treatment operates in a different paradigm. Michigan's ballot-access scheme for independent statewide candidates mandates the filing of signatures by no later than 110 days before the general election. M.C.L. § 168.590c(2). My colleagues find this deadline severely burdensome given it occurs fifty days before partisan nominating conventions for attorney general (and other

Bastress, Robert 4/20/2021
For Educational Use Only

Graveline v. Benson, --- F.3d ---- (2021)

statewide offices). *See also* *Graveline*, 747 F. App'x at 413.[2] But all thirty of the committees relied on were those formed for *gubernatorial* campaigns, and the major parties select their nominees for that position through the traditional primary process and not via nominating conventions. M.C.L. § 168.53. And in 2018, for example, that occurred on August 7, 2018—about two weeks after *Graveline's* July 19 signature deadline. These other committees are thus immaterial for purposes of plaintiffs' claims here.[3]

This factual distinction notwithstanding, there is a broader problem with finding constitutional fault with Michigan's signature, geographic, and durational requirements. It equates proof that individuals formed committees to seek statewide offices (which must be done to begin fundraising, collect signatures, and conduct other campaign activities) with proof establishing these same individuals attempted to qualify for the ballot. The first is a requisite for the second, but the same cannot be said in reverse. Simply, that several candidates formed campaign committees says absolutely nothing about whether the statutory scheme inhibited them from satisfying that scheme. There is nothing in the record that demonstrates the three elements of the statutes plaintiffs challenge operated to preclude those other individuals from the ballot. That is, we know nothing about *how many*, *where from*, and *when* they collected signatures. Indeed, we do not even know if they collected any at all.

The only other record evidence relating to the burden imposed on plaintiffs comes from the State's expert, Lee Albright. As my colleagues note, Albright's report makes clear that mounting a signature-collection campaign requires significant effort, resources, and time. But that is not a controversial proposition. *See* *Libertarian Party of Kentucky v. Grimes*, 835 F.3d 570, 577 (6th Cir. 2016) (states have "an important interest in ensuring that candidates demonstrate a 'significant modicum of support' before gaining access to the ballot, primarily in order to avoid voter confusion, ballot overcrowding, and frivolous candidates" (quoting *Jenness v. Fortson*, 403 U.S. 431, 442, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971))). Nor does it render a state's ballot-access laws "severe." *Id.* ("[T]he incidental costs of gathering signatures on petitions do not come close to exclusion from the ballot, and thus do not impose a severe burden on ballot access.").

*17 But more to the point, Albright was unequivocal with respect to whether Michigan's 30,000-signature requirement within 180 days wholly precludes a candidate from the ballot: "[G]athering 30,000 valid signatures of qualified Michigan voters within the 180 days allowed can most certainly be done." Plaintiffs did not challenge Albright's it's-hard-but-doable conclusion below or offer their own rebuttal expert report. Sure, we have acknowledged that this does not preclude a severe-burden conclusion per se, *see* *Libertarian Party of Ohio*, 462 F.3d at 592, but we have also made clear that history alone is not enough, *id.* at 589–90. And we have also categorically rejected the proposition that "establishing ... an independent deadline set before or at the same time as a state's primary election is *necessarily* unconstitutional." *Green Party of Tennessee v. Hargett*, 767 F.3d 533, 548 (6th Cir. 2014). Simply, more evidence is required to sustain a severe-burden finding than was put forth here.

In sum, the record facts establish only that one candidate has ever even attempted to qualify as an independent candidate for a statewide office—plaintiff Christopher Graveline. He collected nearly half the signatures required (14,157) in less than a quarter of the time permitted (42 days). And neither the district court below nor my colleagues today contend his effort was reasonably diligent given his significant delay in starting his signature-gathering effort. *See* *Storer v. Brown*, 415 U.S. 724, 742, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974); *see also Graveline*, 747 F. App'x at 417 (Griffin, J., dissenting). Accordingly, I cannot agree that plaintiffs satisfied their burden to establish Michigan's statutory scheme infringes upon their constitutional rights. *See* *Hargett*, 767 F.3d at 548–49 & n.4.[4]

B.

There is another problem with the majority opinion's severe-burden conclusion—it is inconsistent with our caselaw created in the wake of the COVID-19 pandemic. *See* *Kishore v. Whitmer*, 972 F.3d 745 (6th Cir. 2020).

Like in many other states, the Governor of the State of Michigan ordered the public to take drastic steps to mitigate

Bastress, Robert 4/20/2021
For Educational Use Only

Graveline v. Benson, --- F.3d ---- (2021)

the spread of COVID-19 beginning in March 2020, including prohibiting most public gatherings. The State's Stay-at-Home Order, combined with its announced strict enforcement of election-related signature requirements, meant that those seeking to collect signatures required to appear as candidates (or to have an initiative be placed on a ballot) could not gather the requisite signatures. So they turned to the federal courts for relief. *See, e.g.*, *id.*; *Esshaki v. Whitmer*, 813 F. App'x 170 (6th Cir. 2020) (order); *SawariMedia v. Whitmer*, 963 F.3d 595 (6th Cir. 2020) (order).

*Kishore* is directly on point. That matter dealt with two independent candidates for president and vice president. 972 F.3d at 747. They faced the same signature-gathering provisions *Graveline* challenges here: the collection of 30,000 signatures (as modified by the district court's injunction in this case), from at least 100 registered voters in at least half of Michigan's congressional districts, all within a 180-day window that closed in July. *Id.* at 747–48. Even with limitations wrought by the pandemic and the State's response to it, we held the burden imposed by Michigan's statutory scheme on an independent candidate could be no more than intermediate. *Id.* at 750. Because there is no connection between those extraordinary limitations and plaintiffs' challenge today, no reading of *Kishore* supports finding a severe burden here.

*18 My colleagues primarily distinguish *Kishore* by pointing to a footnote where we referenced the district court's reduction to 12,000 signatures that we address today. *Id.* at 748 & n.1. In their view, the 18,000 additional signatures *Graveline* had to collect makes all the difference for why we should find a severe, and not intermediate, burden. I do not agree that the statute's 30,000-signature requirement that applies in ordinary times is somehow more constitutionally oppressive than having to gather 12,000 signatures during the initial surge of the COVID-19 pandemic in early 2020 when the State of Michigan (like other states) aggressively restricted nearly every aspect of daily life. *See* *Thompson v. DeWine*, 959 F.3d 804, 806, 809 (6th Cir. 2020) (per curiam). As I read *Kishore*, its analysis turned not on numerical differences in signature gathering, but rather on the timing of those collected signatures and the plaintiffs' lack of reasonable steps—just like *Graveline* here—to collect those signatures. 972 F.3d at 750. If its decision hinged on the 12,000-signature requirement (as my colleagues posit), one would expect *some* mention of it in the burden analysis, yet we made only a

fleeting reference to the lower threshold while setting forth that case's facts and procedural history. *See* *id.* at 748 & n.1.

*Grimes* further buttresses this intermediate-burden conclusion. There we considered Kentucky's election-law scheme that gives political candidates who are members of a political party "blanket access" to the ballot—by way of nomination or primary election—if that political party received two percent of the vote of the state in the last presidential election. 835 F.3d at 572. And if it did not, then candidates could file petitions to be placed on the ballot, which requires, among other things, 5,000 signatures for statewide offices, collected within a year of the election, and filed by the second Tuesday in August preceding the general election. *Id.* at 572–73. We concluded this system imposed only an intermediate burden for several reasons—the greater financial costs associated with minor parties achieving ballot status "did not constitute exclusion or virtual exclusion from the ballot," and third-party candidates had appeared on the ballot in years past using the petition system. *Id.* at 575–76. Importantly, we reasoned the "combined effect" of Kentucky's system did not severely burden ballot access because, among other reasons,

> Kentucky allows political groups to file petitions for candidacy three months before the general election, and provides such groups approximately nine months to gather a quantity of signatures that amounts in almost all cases to less than 0.3% of the number of registered voters in the political unit that corresponds to each office.

*Id.* at 576. Michigan's scheme, although slightly more restrictive (.72% within six months), is in accord. *See also* *Jenness*, 403 U.S. at 438, 91 S.Ct. 1970 (approving of a 5% signature requirement to be collected over a six-month period).

So too does *Lawrence v. Blackwell*. As here, that matter addressed a challenge to a state's scheme governing ballot access for independent (as opposed to minor party) candidates. 430 F.3d 368, 370 (6th Cir. 2005). The plaintiff there wanted to run as an independent candidate for Congress, which, under

Bastress, Robert 4/20/2021
For Educational Use Only

Graveline v. Benson, --- F.3d ---- (2021)

Ohio law, meant that he had to file a nominating petition with at least one percent of the electors in his congressional district on the day before the primary election. *Id.* We found unpersuasive the argument that this early filing scheme unconstitutionally burdened independent candidates. As here, the earlier filing deadline was "not so early that a diligent candidate cannot meet the requirement," and it was "reasonable because it prevents such candidates from being able to make a decision to run for office after learning which candidates will be representing the major parties." *Id.* at 373–74. And we expressly noted "there is nothing in the case law which suggests that a state is required to give independent candidates the advantage of jumping into a race in response to late-breaking events which impact the political landscape when major parties do not have the same flexibility." *Id.* at 374.

*19 At the motion-to-stay stage of this litigation, we distinguished *Lawrence* (given the one-day difference in filing deadlines for independent and primary candidates) and instead relied on *Libertarian Party of Ohio*, 462 F.3d at 579. *See Graveline*, 747 F. App'x at 413–14. We follow that blueprint again today. I remain unconvinced.

First, *Libertarian Party of Ohio* dealt not with a scheme governing independent candidates, but a minor party's ability to access the ballot. *462 F.3d at 586–91.* A review of that opinion reveals our analysis turned on our conclusion that those restrictions "serve[d] to prevent a minor political party from engaging in the most fundamental of political activities—recruiting supporters, selecting a candidate, and placing that candidate on the general election ballot in hopes of winning votes and ultimately, the right to govern." *Id.* at 590. We came to this conclusion by emphasizing the Supreme Court's preference for permitting the development of "new political parties," *id.* at 588, and political parties' relationships with the voters' First Amendment rights, *id.* at 588–89. We then took those observations and found a severe burden on those rights because Ohio's scheme resulted in a monopolization by two political parties. *Id.* at

589. The present matter, however, implicates no such institutional, political-party concerns.

Second, in today's hyperpolitical environment, I cannot draw, as do my colleagues, an inference that Michigan's scheme burdens independent candidates differently by requiring them to campaign when the public is not yet focused on election matters. One could argue Michigan's electorate was already politically motivated during the period in which *Graveline* was collecting signatures to run as an independent candidate. By July 2018, Michigan voters had already signed enough petitions to place one legislative initiative and two constitutional amendments on the ballot. All three involved hundreds of thousands of signatures that were filed *before* *Graveline's* filing deadline (and two were filed in late 2017, before *Graveline* could even *begin* collecting signatures in January 2018).[5] Moreover, in that spring and summer, there were active campaigns for two hotly contested statewide races, culminating in an August 7 primary election for governor for three parties (with over two million voters choosing among eleven candidates) and the Republican nominee for Senate (with close to a million voters participating there).[6] At the very least, the record does not support the majority's finding here. We should hold the parties to evidence for this proposition, *see* *Anderson v. Celebrezze*, 460 U.S. 780, 792 & n.14, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), instead of just accepting general statements of the law.

For these reasons, I conclude Michigan's statutory scheme imposes an intermediate burden under *Anderson*-*Burdick.*

II.

Because the burden here is intermediate, *Anderson*-*Burdick's* second and third steps merit little consideration. At the second step, we have already approved Michigan's justifications for its ballot-access laws governing independent

Bastress, Robert 4/20/2021
For Educational Use Only

Graveline v. Benson, --- F.3d ---- (2021)

---

candidates: "the signature requirement ensures that a candidate has a modicum of support before appearing on the ballot in order to further the State's interest in a fair and orderly election by avoiding ballot overcrowding, frivolous candidates, and voter confusion" and the "filing deadline is essential to ensure an orderly, timely election." *Kishore*, 972 F.3d at 750–51; *see also Grimes*, 835 F.3d at 577 (similar). And to the balancing point that is the third step, our review is "less exacting ..., and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions" given we deal here with "lesser burdens." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997) (internal quotation marks omitted). *Kishore* commands that these interests outweigh the burden imposed on independent candidates. 972 F.3d at 751; *see also Lawrence*, 430 F.3d at 375 (finding justifiable similar interests in relation to a one-percentage showing with an early-submission deadline and commenting that "a wide range of methods of requiring potential candidates to show support have been upheld as legitimate means to achieve this important state interest"). It is not our job to "second-guess the legislative decisions of the [Michigan Legislature] but only to evaluate whether those decisions pass constitutional muster." *Grimes*, 835 F.3d at 578. As set forth, "the strength of [Michigan]'s interests in avoiding voter confusion, ballot overcrowding, and frivolous candidacies outweighs the modest burden of the ballot-access regulations on [plaintiffs]." *Id.*

preliminary injunction mandating that defendants place Graveline's name on the ballot if he could demonstrate that he collected at least 5,000 valid signatures with at least 100 of those from registered voters in each of at least half of the State's 14 congressional districts. *Graveline v. Johnson*, 336 F. Supp. 3d 801, 817 (E.D. Mich. 2018). But after Graveline's name appeared on the 2018 general-election ballot, the district court resolved plaintiffs' claims on the merits and found 5,000 to be insufficient to protect Michigan's interests and then more than doubled it to 12,000 when devising a remedy. 430 F. Supp. 3d at 318. And today, we officially nullify Michigan's election laws simply because one dilatory candidate was unsuccessful in fulfilling Michigan's reasonable statutory requirements. Determining the appropriate signature threshold—whether 5,000, 12,000, 30,000, or some other number—is best left to Michigan's elected representatives, not federal judges. *See Esshaki*, 813 F. App'x at 172 (concluding that lower court lacked authority to rewrite the same ballot-access provisions at issue here because "federal courts have no authority to dictate to the States precisely how they should conduct their elections").

For these reasons, I respectfully dissent. I would reverse the judgment of the district court.

All Citations

--- F.3d ----, 2021 WL 1165186

### III.

*20 This case illustrates once again why applying *Anderson*-*Burdick*'s grant of discretion to the federal judiciary can lead to tension with the principles of federalism and separation of powers. *Cf. Daunt v. Benson*, 956 F.3d 396, 424 (6th Cir. 2020) (Readler, J., concurring). Before the 2018 general election, the district court entered a

Bastress, Robert 4/20/2021
For Educational Use Only

Graveline v. Benson, --- F.3d ---- (2021)

---

Footnotes

1    Graveline was able to comply with the geographic distribution requirement.

2    The dissent attempts to distinguish *Libertarian Party of Ohio* from the instant case because it concerns a minor party's ability to access the ballot and not independent candidates. Dissent at ——. However, the Supreme Court has recognized the importance of protecting independent candidates' access to the ballot as well. As the Court explained in *Anderson*:
     A burden that falls unequally on new or small political parties or on *independent candidates* impinges, by its very nature, on associational choices protected by the First Amendment. It discriminates against those candidates and—of particular importance—against those voters whose political preferences lie outside the existing political parties. By limiting the opportunities of independent-minded voters to associate in the electoral arena to enhance their political effectiveness as a group, such restrictions threaten to reduce diversity and competition in the marketplace of ideas. Historically political figures outside the two major parties have been fertile sources of new ideas and new programs; many of their challenges to the status quo have in time made their way into the political mainstream. In short, the primary values protected by the First Amendment—"a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 [84 S.Ct. 710, 11 L.Ed.2d 686] (1964)—are served when election campaigns are not monopolized by the existing political parties.
     *Anderson*, 460 U.S. at 793–94, 103 S.Ct. 1564 (footnote and internal citations omitted) (emphasis added). In short, the effect of Michigan's statutory scheme on independent candidates and like-minded voters implicates the same institutional and associational concerns as the ones raised in *Libertarian Party of Ohio*.

3    In 1999, Michigan amended its signature requirement for independent candidates for statewide office by changing it from one percent of the total vote for governor in the preceding election to the current requirement of 30,000 signatures. Neither party contends that this change was material.

4    The district court noted that these records "are incomplete in material ways." *Graveline*, 430 F. Supp. 3d at 302. For example, the records do not go back to 1988, which is when Michigan implemented the statutory scheme. They also do not include the number of candidates who attempted to run for United States Senate in Michigan.

5    The dissent raises another concern about the significance of this evidence; it argues that the formation of campaign committees "says absolutely nothing about whether the statutory scheme inhibited [the candidates] from satisfying the scheme." Dissent at 32. We struggle to imagine how an absolute dearth of independent candidates appearing on the ballot, even though several have received either donations or volunteer efforts to launch their campaign, says nothing about whether the statutory scheme in which these campaigns operated inhibited their efforts to qualify. But putting that aside, as discussed below, Plaintiffs highlighted evidence in the record that substantiates what the absence of independent candidates already signals—a severe burden imposed by the statutory scheme as a whole.

1    I agree, however, that defendants' standing and mootness arguments are not meritorious.

2    I note that bipartisan bills are currently pending in both chambers of Michigan's legislature that would fundamentally alter Michigan's primary system. *See, e.g.*, S.B. 130 and H.B. 4530, 2021-22 Leg., 101st Sess. (Mich. 2021). Although the current version of the bills do not appear to materially alter the State's nominating-convention statute relied upon by my colleagues to hold in plaintiffs' favor, *see* M.C.L. § 168.591(1), any change should merit close review in the future as it relates to maintaining the district court's permanent injunction now approved by the majority.

Bastress, Robert 4/20/2021
For Educational Use Only

Graveline v. Benson, --- F.3d ---- (2021)

---

3       Nor do the records demonstrate these other "candidates" did much, if anything, to advance their campaigns. Take the
        seven who formed committees in 2018. Two were formed about two weeks before the general election—well past the
        July signature-gathering deadline. The five that were timely formed reported little to no contributions or expenditures,
        which undermines any argument regarding the genuineness of their "campaigns."

4       For this same reason, the district court wrongly faulted defendants for "fail[ing] to cite any authority for the proposition
        that a plaintiff challenging ballot access laws must produce evidence of candidates who tried but failed to qualify."
        *Graveline v. Benson*, 430 F. Supp. 3d 297, 311 (E.D. Mich. 2019). As *Hargett* makes clear, that shifting of the
        burdens—which my colleagues adopt by criticizing the State for "not put[ing] forth any evidence to justify" the lack of
        independent candidates—is untenable. 767 F.3d at 548 & n.4 (discussing how *plaintiffs* could develop a factual record
        when challenging a state's ballot-access scheme).

5       *See, e.g.*, Michigan Dep't of State, State of Michigan Statewide Ballot Proposals, Sept. 19, 2018, *available at*
        https://www.michigan.gov/documents/sos/Bal_Prop_Status_560960_7.pdf.

6       *See* Michigan Dep't of State, 2018 Michigan Election Results, https://mielections.us/election/results/2018PRI_CENR.
        html.

---

**End of Document**                                               © 2021 Thomson Reuters. No claim to original U.S. Government Works.